IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| NOZAR NAGHANI, | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | CIVIL ACTION H-17-3836 |
| | § | |
| SHELL EXPATRIATE EMPLOYMENT | § | |
| US INC. *et al.*, | § | |
| | § | |
| *Defendants.* | § | |

## MEMORANDUM OPINION & ORDER

Pending before the court is a motion for summary judgment filed by defendants Shell Expatriate Employment US Inc. ("Shell Expatriate") and Shell International Exploration and Production Inc. ("Shell International") (collectively, "Shell"). Dkt. 33. Plaintiff Nozar Naghani ("Naghani") responded (Dkts. 39, 42), and Shell replied (Dkt. 45). Having considered the motion, response, reply, and applicable law, the court is of the opinion that Shell's motion should be GRANTED.[1]

## I. BACKGROUND

This case is an employment discrimination dispute between Naghani, an American engineer born in Iran, and his former employer, Shell. Dkt. 1. According to Naghani, the oil and gas company violated Title VII of the Civil Rights Act of 1964 when it terminated his employment because of his national origin. *Id.* at 7-11.

In March 2013, Shell employees, including Bohran Osman ("Osman"), interviewed Naghani for a job as a front end engineer in Miri, Malaysia. Dkt. 33-1 at 25. At that time, Naghani had

---

[1] Because the court grants Shell's motion for summary judgment (Dkt. 33), its pending motion to exclude Naghani's economic expert (Dkt. 34) should be DENIED as MOOT.

worked as an engineer for over two decades but never as a front end engineer.  Dkt 33-5 at 35.  Even though he lacked that particular experience, Shell believed that Naghani could fill the role.  *Id.*; Dkt. 33-4 at 96.

In May 2013, Shell offered Naghani that job.  Dkt. 33-1 at 25.  Shell conditioned its at-will offer on securing an expatriate work permit for Naghani.  *Id.* at 25, 30.  To secure that permit, Shell needed approval from a state-owned oil and gas company, Petroliam Nasional Berhad ("PETRONAS").  *Id.* at 82.  In October 2013, PETRONAS approved Naghani to work for two years as a front end engineer specialist if he helped train local front end engineers.  *Id.*; Dkt 33-8 at 55 ("Shell shall ensure that the expatriate incumbent undertakes necessary coaching, development and mentoring of the new Malaysian Front End Engineering Lead . . . as well as other junior front end engineers in [sic] the team.").  Before he began work, Shell changed Naghani's expected job title from "front end engineer" to "front end engineer specialist."  Dkt. 33-8 at 54.

In December 2013, Naghani moved to Malaysia to start working.  Dkt. 33 at 12.  He reported to Osman, a Malaysian engineer.[2]  *Id.*  Naghani was the only American engineer that Osman supervised.  Dkt. 39 at 2; Dkt. 33-5 at 35.  And, he was the only engineer with a Middle Eastern accent or that appeared Middle Eastern.  Dkt. 39 at 3.

Starting in February 2014, Osman held one-on-one meetings with Naghani.  *Id.*  In those meetings, Osman criticized Naghani's work and "made maybe 15 to 20 . . . remarks that [we]re discriminatory."  Dkt. 33-5 at 92.  Naghani thought that Osman's conduct was "discriminatory because [Naghani] never heard [Osman] do the same thing to anybody else."  *Id.* at 96.

---

[2]  At some point, Naghani also reported to another Shell employee.  Dkt. 33-4 at 53.

In June 2014, Osman conducted Naghani's mid-year performance review.  Dkt. 33-4 at 13. Before that review, Osman asked Naghani to suggest people "who he worked closely with or . . . other people that he might have interaction with." *Id.*  Osman contacted those people to learn about Naghani's performance. *Id.*  Naghani received mixed feedback. *Id.* at 14 (Osman Dep.) ("I know he's got some good feedback[.]"); Dkt. 33-5 at 42 (Naghani Dep.) ("There was positive feedback, negative feedback, and a bunch of misunderstandings.").

In October 2014, Osman met with Naghani to review some ongoing performance issues. Osman explained his belief that Naghani "had a mis-match of skillsets [sic] against the job he was hired to do."[3]  Dkt. 33-1 at 59.  Osman believed that Naghani needed to improve his performance to stay in Malaysia.  Dkt. 33-4 at 20 (Osman Dep.) ("I highlighted the underperformance of Mr. Naghani at that time and if he continued with the underperformance, you know. . . the chances are he may be repatriated based on the performance issues."); Dkt. 33-5 at 49 (Naghani Dep.) ("[Osman] told me that he 'would release me unless if [sic] I significantly improve my work within one-and-a-half months[.]'"); *id.* ("[Osman] said that . . .'[i]f you don't significantly improve your deliverables, I will release you.'").

Naghani asked for six months (until April 2015) to improve his performance.  Dkt. 33-6 at 105.  Osman told Naghani that "the possibility of extending . . . [would be] rather remote if [he] continue[d] performing at [his] current level." *Id.* at 104.  Osman also stated that Naghani's "situation could be a case of the job not sufficiently matching against [his] skill set." *Id.*

---

[3] According to Shell's internal investigation, "it [was] surprising" that Osman "should be noticing a mismatch of skill sets, a few months after recruiting a staff [sic] for which he participated in his interview."  Dkt. 33-1 at 59.

3

In mid-October 2014, Shell planned to repatriate Naghani within two months because he "apparently d[id] not have the right skill set and experience, and he also ha[d] a preference to be in Project Services." Dkt. 42-1 at 11. A Malaysia-based human resources ("HR") manager contacted stateside employees to try to find Naghani a new role in the United States. Dkt. 42-2 at 3. One stateside HR employee stated a preference for a slower repatriation timeline. *Id.* That employee explained that repatriating Naghani within two months–and just as Shell's internal hiring cycle ended–would limit his chances at finding a new role. *Id.* at 2. If he did not secure a new job within ninety days, he could face severance. *Id.*

Later that month, Naghani told HR that he wanted to continue working in Malaysia. Dkt. 33-6 at 110. He did not understand if he was "being fired from Shell altogether or . . . being repatriated . . . and assigned to a new job[.]" *Id.*

In early November, Naghani e-mailed Osman and other Shell employees to "raise[] the issue to . . . the HR" department about Osman's conduct. Dkt. 33-5 at 91. Naghani "fel[t] that [he was] not being treated fairly." *Id.* at 114. He also "fe[lt] that [he was] being discriminated against" because Osman "mentioned more than once . . . that [he] [had] higher expectations from [Naghani] compared to [his] coworkers . . . simply because [he] cost [Shell] more (i.e., [his] salary [was] paid in stronger currency)." *Id.*

Naghani also believed that "Osman treated [him] differently" than other engineers because Naghani was American. Dkt. 1 at 3. In one-on-one meetings from February through October 2014, Osman set an "unusual number of higher expectation[s]" for Naghani because he was American. Dkt. 33-5 at 90 (Naghani Dep.); *id.* ("'the expectations from you are higher because you're an

American[.]'"").  Osman told Naghani that "'[b]ecause you're American you're expected to . . . act as a senior and as lead and you're expected to deliver more than locals.'"  *Id.*  Osman also told Naghani that he "'was not behaving like an American" and that he "'should behave like an American.'"  *Id.* at 91.  In addition, Osman told Naghani that he could "'hire two locals with [Naghani's] salary,'" and that Naghani "'should deliver more than two locals,' basically."  *Id.*

At some point after their October 2014 meeting, Osman told Naghani "'[i]f you challenge my repatriation decision, I will put you under the [performance improvement plan ("PIP"), and you will be terminated.'" Dkt. 33-5 at 61.

On November 13, 2014, Naghani asked Shell's compliance department to investigate Osman's discriminatory conduct.  Dkt. 39 at 10.

The next day, Naghani challenged the repatriation decision.  Dkt. 33-6 at 3; Dkt. 33-12 at 35. He also asked why Shell chose repatriation over a PIP.  *Id.*  Even so, Naghani stated that he opposed a PIP.  Dkt. 33-12 at 35.  According to Naghani, "a formal PIP process c[ould] never be handled in a fair manner by [Osman]" because Osman "ha[d] motivations and his approach ha[d] been hostile since October[.]"  *Id.* at 33.

Shell told Naghani that it chose to put him on a PIP rather than repatriate him.  Dkt. 33-6 at 3, 117.  The company told Naghani that Shell uses a PIP when an employee needs a plan to return to a certain performance level.  Dkt. 33-12 at 34.  But, if the employee does not improve, "then [the PIP] . . . likely end[s] up with a termination."  *Id.*

Naghani's PIP ran from December 22, 2014 through March 24, 2015.[4]  Throughout the PIP, Osman, Naghani, and a local HR employee met to work through its steps.  Dkt. 33-6 at 117-38, 143. Among other performance-related issues, the PIP revealed that Naghani could not coach, mentor, and develop local Malaysian staff.  *Id.* at 117.   In other words, Naghani did not meet the PETRONAS conditions.  *Id.*  In the final progress review, Shell summarized "[t]he key areas where [Naghani] [did] not me[e]t the job requirements" as: (1) "independently identify[ing] most critical issues when integrating complex or incomplete data"; (2) "deliver[ing] results by setting challenging targets and setting priorities"; and (3) "deliver[ing] on commitments towards a consistent and acceptable standard and manag[ing] the performance of a range of functions to ensure appropriate delivery across the business."  *Id.* at 138.

For those reasons, on April 13, 2015, Shell notified Naghani that: (1) his "performance remain[ed] unsatisfactory"; and (2) the company decided "to initiate [his] repatriation[.]"  *Id.* at 143. The next day, Naghani told Shell that he "d[id] not agree with it."  *Id.* at 143.  And, a day later, Shell gave Naghani "up to three months" to repatriate.[5]  *Id.*  He did not do so.  Dkt. 39 at 11 n.10.

---

[4]  Outside of the PIP, Shell continued to review Naghani's performance as it would for its other employees. In January 2015, Osman rated Naghani's 2014 performance with an internal Shell metric called the individual performance factor ("IPF").  Dkt. 33-5 at 105; Dkt. 33-6 at 4.  Naghani received a 0.6 out of 1.5.  *Id.*  He believed that score was "a death sentence" to his career because "any IPF below .7 is a red flag and . . . that employee is not hireable" for other Shell jobs.  Dkt. 33-5 at 103, 125.  Osman based Naghani's IPF "on his overall performance relative to others in the same Salary Group 03."  *Id.* at 4.  Osman recalled that Naghani "had the lowest IPF" because his peers "performed relatively at a much higher level than Mr. Naghani."  *Id.*  Osman also stated that Naghani "clearly demonstrated a lack of the expected and required skill set to perform the job duties at the level of his salary group and the responsibilities of his position."  *Id.*

[5]  Shell tried to help Naghani book his return trip to the United States.  Dkt. 42-7 at 21-23.

6

In July 2015, Shell terminated Naghani.  *Id*.  Naghani left Malaysia a year later.  *Id.*  He stayed to: (1) "look[] seriously into starting a business"; (2) "communicat[e] with HR"; and (3) "gather[] evidence to support his claims of discrimination[.]"  *Id.*

On October 22, 2015, Naghani filed a charge with the Equal Employment Opportunity Commission ("EEOC").  On December 21, 2017, Naghani sued Shell to recover for national origin discrimination, retaliation, and a hostile work environment.  Dkt. 1.  Shell moved for summary judgment on those claims.  Dkt. 33.  That motion is now ripe for disposition.

## II. LEGAL STANDARD

A court shall grant summary judgment when a "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "[A] fact is genuinely in dispute only if a reasonable jury could return a verdict for the nonmoving party."  *Fordoche, Inc. v. Texaco, Inc.*, 436 F.3d 388, 392 (5th Cir. 2006).  The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2540 (1986).  If the moving party meets its burden, the non-moving party must set forth specific facts showing a genuine issue for trial.  Fed. R. Civ. P. 56(e).  The court must view the evidence in the light most favorable to the non-movant and draw all justifiable inferences in its favor.  *Envtl. Conservation Org. v. City of Dall.*, 529 F.3d 519, 524 (5th Cir. 2008).

## III. ANALYSIS

### A.    Employment Discrimination Based on National Origin

Naghani claims that Shell violated Title VII by "engag[ing] in a continuing course of

discriminatory conduct in the terms, conditions, and privileges of employment, throughout his employment up to and including his termination, because of his national origin[.]"  Dkt. 1 at 8. Under Title VII, an employer cannot "discharge . . .  or otherwise . . . discriminate against any individual with respect to his compensation, terms, conditions or privileges of employment, because of such individual's . . .  national origin."  42 U.S.C. § 2000.

Initially, Naghani must establish a prima facie case of national origin discrimination by showing that: (1) he belongs to a protected group; (2) he was qualified for the position; (3) Shell discharged him; and (4) Shell replaced him with someone outside of his protected group or Shell treated him less favorably than other similarly-situated employees outside of his protected group. *See Thomas v. Tregre*, 913 F.3d 458, 462 (5th Cir. 2019) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817 (1973)); *id.* (citing *McCoy v. City of Shreveport*, 492 F.3d 551, 556 (5th Cir. 2007) (per curiam)).   If Naghani succeeds, then Shell must articulate a legitimate, nondiscriminatory reason for terminating Naghani.  *See id.*  Finally, the burden shifts back to Naghani to show that Shell's reason is a pretext for discrimination.  *See id.*

The court assumes without deciding that Naghani meets his initial burden, because Shell articulates two nondiscriminatory reasons for terminating Naghani to rebut the presumption that would arise if Naghani established a prima facie case.[6]

---

[6] To preserve a Title VII claim, an employee must file an EEOC charge within 300 days of an allegedly unlawful employment practice.  *EEOC v. WC&M Enters., Inc.*, 496 F.3d 393, 397 (5th Cir. 2007).  In addition, "[b]ecause a hostile work environment [claim] generally consists of multiple acts over a period of time," the employee must file the charge "within 300 days of *any* action that contributed to the hostile work environment."  *Id.* (emphasis added).  "If that requirement is met, the court may consider all . . . acts . . . alleged to have contributed to the hostile work environment, even though some . . . may have taken place outside of the 300–day filing period."  *Id.*  Shell asks the court to disregard as untimely any conduct that occurred before December 26, 2014 (i.e., 300 days before Naghani filed his charge).  Dkt. 33 at 20-21; Dkt. 45 at 4 n.3.  Naghani points to his July 2015 termination as the "'ultimate employment action' on which he premises this lawsuit."  Dkt. 39 at 15.  And, he argues that earlier conduct "constitute[s] probative evidence of discriminatory animus."  *Id.* at 16.  Naghani asserts timely claims.  *See WC&M*, 496 F.3d at 397.

*See Tex. Dep't of Comm. Affairs v. Burdine*, 450 U.S. 248, 253-54, 101 S. Ct. 1089 (1981).

To meet its intermediary burden, Shell only needs to set out its reason for terminating Naghani through admissible evidence. *See Turner v. Kan. City S. Ry. Co.*, 675 F.3d 887, 900 (5th Cir. 2012). Shell states that it terminated Naghani because of his: (1) intent "to remain in Malaysia rather than repatriate to the United States"; and (2) "continued unsatisfactory performance." Dkt. 33 at 27; Dkt. 33-1 at 58. Shell carries its burden. *See, e.g., Mathiew v. Subsea 7 (US) LLC*, No. 4:17-cv-3140, 2019 WL 93389, at \*4 (S.D. Tex. Jan. 2, 2019) (Ellison, J.) (poor performance satisfied company's intermediary burden); *see also Shackelford v. Deloitte & Touche LLP,* 190 F.3d 398, 409 (5th Cir. 1999) ("the real issue is 'whether [the employer's] perception of [the employee's] performance, accurate or not, was the real reason for [his or] her termination.").

Because Shell offers two nondiscriminatory reasons, Naghani must rebut each one. *See McCoy*, 492 F.3d at 557 (requiring employee to rebut each nondiscriminatory reason). To do so, Naghani can show that Shell's explanations are false or unworthy of credence, or he can use evidence of disparate treatment. *See Mackey v. Enventives, L.L.C.*, -- F. App'x --, No. 19-10605, 2020 WL 1026516, at \*2 (5th Cir. Mar. 2, 2020) (quoting *Vaughn v. Woodforest Bank*, 665 F.3d 632, 636 (5th Cir. 2011)); *Laxton v. Gap, Inc.*, 333 F.3d 572. 578 (5th Cir. 2003). He does not carry his burden. Dkt. 39 at 25-30.

First, Naghani challenges his failure to repatriate as a reason for his termination. Dkt. 39 at 20. In support, he states that "he was told that he was being let go from the Malaysia project and he was given a letter indicating that his assignment had ended." *Id.* Without any evidence, he states

that "[h]e was told that he could repatriate to the United States, but [Shell] refused to pay for repatriation." *Id.* at 21.

That argument fails.  Naghani knew that he had three months to repatriate and that the company tried to help book his return trip. Dkt. 33-6 at 143; Dkt. 42-7 at 21-23.  He also knew that if he did not return, the company would terminate him on July 15, 2015. Dkt. 42-7 at 21.  But, Naghani did not repatriate by that date. Dkt. 39 at 11 n.10.  Naghani does not raised a triable fact issue on whether his intention to remain in Malaysia (and not repatriate) was a pretext for discrimination.  Because Naghani fails to rebut one of Shell's nondiscriminatory reasons, his claim cannot survive summary judgment.  See *McCoy*, 492 F.3d at 557.

Even if Naghani could rebut Shell's first nondiscriminatory reason, he fails to rebut the second when he challenges poor performance as pretext.  First, he points to good job performance as evidence of pretext. Dkt. 39 at 25.  Everyone agrees that Naghani received some positive feedback. Dkt. 45 at 4.  However, Shell argues that the positive feedback "does not overcome the undisputed and significant negative feedback from critical stakeholders[.]" *Id.*  The court agrees.  *See, e.g., Brown v. Home Depot USA, Inc.*, 642 F. App'x 465, 468 (5th Cir. 2016) (per curiam) (employee's performance awards did not raise a triable fact issue as to pretext when company articulated that it terminated employee with a history of poor performance and no improvement).  Naghani does not raise a triable fact issue on good performance as evidence of pretext.

Naghani also challenges Osman's credibility and argues that Shell "evidences pretext" by relying on Osman's testimony to show that Naghani underperformed. Dkt. 39 at 28.  Naghani asserts that "[t]here is evidence that Osman was dissembling to cover the truth in his insistence that

[Naghani] knew about the job requirements" and in Osman's "failure to notify HR of positive as well as negative stakeholder feedback during performance management." *Id.* Naghani did not cite to that evidence. *Cf. Hernandez v. Yellow Transp., Inc.*, 670 F.3d 644, 651 (5th Cir. 2012) ("If somewhere in a record there is evidence that might show a dispute of material fact, the district court needs to be pointed to that evidence as opposed to having to engage in an extensive search."). And, it is undisputed that: (1) Naghani knew about the PETRONAS conditions almost two months before he started the job (*see* Dkt. 39 at 3-4); and (2) Osman told HR about positive feedback (*see* Dkt. 33-5 at 30, 51; Dkt. 39 at 6). As a result, Naghani has not raised a triable fact issue on Osman's credibility.

Naghani also contends that Shell's failure to follow its own procedures constitutes evidence of pretext. Dkt. 39 at 26-28 (on-boarding, repatriation, and performance-management procedures). This argument hinges on Shell's failure to "document alleged performance deficiencies" and the company's lack of "documentation that would support the imposition of a PIP[.]" *Id.* Although Shell's failure to follow its own disciplinary policies could raise a triable fact issue, Naghani did not cite to the type of evidence needed to do so. *See, e.g.*, *Taylor v. Peerless Indus. Inc.*, 322 F. App'x 355, 367 (5th Cir. 2009) ("In the absence of any evidence that [the employer] generally followed the four steps outlined in its disciplinary policy, or that the policy was applied differently to similarly situated employees, the fact that [the employer] did not follow [those] steps does not provide any relevant information regarding whether [the protected characteristic] played a role in . . . termination.").

Naghani also points to an inadequate investigation as evidence of pretext. Dkt. 39 at 29. Without record cites, he states that "no adequate investigation was conducted in regard to [his] complaint locally" and "none was conducted by compliance until he called investigators on the carpet,

11

which is indicative of discriminatory and retaliatory animus." *Id.* In support, Naghani cites a factually-distinguishable case, *Polanco v. City of Austin*, for the proposition that inadequate or biased internal investigations can indicate discrimination.[7] *Id.* Naghani does not present any evidence that would raise a triable fact issue on the adequacy of Shell's investigation.

Naghani also argues that he raises a fact issue on pretext through differential treatment of other front end engineers. Dkt. 39 at 30. Without record cites, Naghani asserts that he "references evidence of differential treatment of himself and the many other front end engineers who did not complain of discrimination and were not of Iranian American national origin, but had performance problems and were not discipline[d]." *Id.* It is undisputed that Naghani was the only American front end engineer that Osman supervised, and the only one born in Iran. Even if Naghani sufficiently references other employees who had performance issues but were not terminated, he does not raise a triable fact issue on whether those employees had essentially comparable performance issues. *See Hernandez*, 670 F.3d at 659 (preferable treatment of similarly-situated employees was not a pretext when employee did not show that employment actions occurred under "nearly identical circumstances" including "essentially comparable violation histories, and, most importantly, that the conduct that drew the adverse employment decision was nearly identical.").

Naghani does not carry his burden to raise a triable fact issue on pretext. Accordingly, his claim for national origin discrimination cannot survive summary judgment and should be DISMISSED with PREJUDICE.

---

[7] In *Polanco*, a Mexican-American police investigator sued the city for national origin discrimination by alleging that he received harsher discipline than a non-Mexican-American colleague. 78 F.3d 968, 971, 980 (5th Cir. 1996) (affirming judgment for investigator). Unlike in this case, where Naghani complains about the adequacy of his employer's investigation into its own conduct, *Polanco* analyzed bias in an employer's investigation into its employee's conduct. *See id.* at 972, 979.

12

### B.      Retaliation

As with his discrimination claim, the court assumes without deciding that Naghani met his prima facie case on retaliation because Shell articulated two nondiscriminatory reasons for terminating Naghani.[8]  *Burdine*, 450 U.S. at 253-54.  Naghani contends that the close timing between his discrimination complaint and his termination–six months–shows pretext.  Dkt. 39 at 29 (citing *Shackelford*, 190 F.3d at 409, for the proposition that suspicious timing, paired with other significant evidence of pretext can satisfy the summary judgment pretext burden).  Recently, the Fifth Circuit explained that "[a]t the pretext stage, the Supreme Court's decision in *Nassar* requires a showing of but-for causation, which requires more than mere temporal proximity."  *Garcia v. Prof'l Contract Servs., Inc.*, 938 F.3d 236, 243-44 (5th Cir. 2019) (discussing *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 133 S.Ct. 2517, 2533 (2013)).[9]

On its own, six months cannot show causation.  *See id.* at 243 (explaining that the Fifth Circuit has suggested that "four months is close enough," while "[t]he Supreme Court has since approvingly cited case that held three months was insufficient to show causation.").  And, Naghani did not cite any other evidence to raise a triable fact issue on whether Shell's retaliatory motive was the but-for cause for his termination.  Accordingly, his claim for retaliation cannot survive summary judgment and should be DISMISSED with PREJUDICE.

---

[8] *McDonnell Douglas* also applies to Naghani's Title VII retaliation claim.  *See McCoy*, 492 F.3d at 556.  For his prima facie case, Naghani must show that: (1) he engaged in a protected activity; (2) Shell took an adverse employment action against him; and (3) a causal connection exists between that adverse action and his protected activity. *See id.*

[9] *Garcia* involved a claim under the False Claim Act's anti-retaliation provision.  938 F.3d at 241.  The Fifth Circuit analyzed that claim under *McDonnell Douglas*, just as it would with a Title VII retaliation claim like Naghani's. *See id.*

### C.     Hostile Work Environment Based on National Origin

To recover for a hostile work environment under Title VII, Naghani must prove that: (1) he belongs to a protected group; (2) he was subjected to unwelcome harassment; (3) the harassment was based on national origin; (4) the harassment affected a term, condition, or privilege of employment; and (5) Shell knew or should have known about the harassment and failed to take prompt remedial action. *Hernandez*, 670 F.3d at 650. "Harassment affects a term, condition, or privilege of employment if it is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Id.* (quotation marks and citations omitted).

Shell argues that Naghani cannot show that the harassment was "severe or pervasive." Dkt. 33 at 30. Without any record cites, Naghani limits his response to two sentences: "Naghani alleges numerous national origin related harassing statements. The conduct clearly affected the work of Naghani[.]" Dkt. 39 at 31-32. That cannot satisfy his prima facie case. *Cf. Hernandez*, 670 F.3d at 360 (analysis considers all circumstances surrounding the discriminatory conduct including frequency, severity, content (i.e., physically threatening or humiliating), and interference with employee's work performance). Accordingly, his hostile work environment claim fails. As a result, that claim should be DISMISSED with PREJUDICE.

## IV. CONCLUSION

For those reasons, Shell's motion for summary judgment (Dkt. 33) is GRANTED, Naghani's complaint (Dkt. 1) is DISMISSED with PREJUDICE, and Shell's motion to exclude Naghani's economic expert (Dkt. 34) is DENIED as MOOT.

Signed at Houston, Texas on May 18, 2020.

Gray H. Miller
Senior United States District Judge